## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.** 17-cv-2117

**Alan Meins; and Patrick Allen,**

     **Plaintiffs,**

**v.**

**Vestas Blades America, Inc.**

     **Defendant.**

---

## COMPLAINT

---

ALAN MEINS, individually, and PATRICK ALLEN, individually, by and through counsel, GRANT, & HOFFMAN, P.C., do hereby complain against Defendant, VESTAS BLADES AMERICA, INC., as follows:

## <u>INTRODUCTION</u>

1.    The Plaintiffs Alan Meins ("Mr. Meins") and Patrick Allen ("Mr. Allen") have initiated this action to redress violations by Defendant Vestas Blades America, Inc. ("Vestas") of the ADEA, the ADA, Colorado's Anti-Discrimination Law and other common law causes of action associated with Defendant's termination of Plaintiffs, and other adverse actions taken against Plaintiffs during Plaintiffs' employment with Defendant.

1

2.      Both Mr. Meins and Mr. Allen were terminated by Vestas under strikingly similar, albeit distinct, circumstances, with notable similarities including but not limited to the following:

a.   Both were hired into a "Production" position with the company, a broad job category that included a wide range of job duties;

b.   Both were subjected, on a daily basis during their time with Vestas, to hostility and animosity directed against them (as well as other older employees) due to their age;

c.   Both were rebuked and chastised when they deigned to complain about the rampant age discrimination at Vestas, as well as other forms of discrimination, notably lax and insufficient safety procedures, and other issues, and both were warned that, if they continued to complain, they would likely be terminated;

d.   Both suffered crippling physical damage on the job, due to the lax and insufficient safety standards at Vestas;

e.   Both saw those workplace injuries develop into longstanding and/or permanent disabilities;

f.   Both were, in the immediate aftermath of those injuries, given alternate responsibilities with Vestas, and for lengthy periods continued full-time schedules with the company, and both performed admirably in those roles;

g.   Both were abruptly jerked out of those alternate responsibilities by Vestas, following distinct triggering actions – the mention of lodging an EEOC claim by Mr. Allen, and a notice by Mr. Meins that he required surgery and FMLA leave – and both were sent

home by Vestas pending more "available work," despite the fact that plenty of such work was available;

h. Both were left in limbo by Vestas for many months, without any contact or any effort by Vestas to analyze their disabilities or to discuss potential accommodations for those disabilities;

i. Both Mr. Meins and Mr. Allen were ultimately terminated by Vestas, Mr. Meins after being left in limbo for approximately 8 months, and Mr. Allen after 11 months, during which he repeatedly attempted to return to work with the company.

3.      Upon information and belief and based upon the actions of Vestas known by Plaintiffs to date, Vestas' decision to terminate both Plaintiffs – as well as additional adverse actions described herein – were made as soon as Vestas arbitrarily and baselessly determined that there was no longer "meaningful work" for either Plaintiff in light of their physical limitations.  That determination by Vestas was not made based on any actual assessment of available work or the Plaintiffs' respective disabilities, but rather was triggered by unlawful motivations as described in this Complaint.

4.      Vestas would wait almost a full year to formally terminate the Plaintiffs, despite having already decided to terminate them, and Vestas consciously avoided communication with Plaintiffs, or any effort to discuss a return to work.  Vestas refused to return the Plaintiffs' calls, and on the few occasions that the Plaintiffs were successful in reaching Vestas, they were informed that Vestas had no work available for them.  This was a blatant lie, as the company had ample work – both in the light duty capacities the Plaintiffs had previously worked, as well

3

as within the Production worker job categories that both Plaintiffs had been hired into – which Plaintiffs were fully able to perform, with or without reasonable accommodation.

5.        Upon information and belief, and based upon the actions and statements of Vestas known by Plaintiffs to date, Vestas' ultimate decisions to terminate both Plaintiffs were motivated by at least one, if not many, of a variety of unlawful reasons, including but not limited to: (i) their respective disabilities; (ii) their age; and (iii) in retaliation against Plaintiffs' efforts to exercise a range of statutorily protected rights during their time with Vestas, and more particularly in the months leading up to Vestas' decision to terminate Plaintiffs.

## JURISDICTION AND VENUE

6.        The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332, 1343 and 1367, and this action is authorized and instituted pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12133, and generally 42 U.S.C. § 12101 *et seq* and to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §626, and generally 29 U.S.C. §621 *et seq*., and the Family and Medical Leave Act, 29 U.S.C. § 2617 *et seq*. This Court has original subject matter jurisdiction over this matter pursuant to the above statutes, and this Court has jurisdiction over Plaintiffs' state law claims because they are supplemental to Plaintiffs' underlying federal claims and arise out of the same acts, transactions or occurrences, having the same common nucleus of operative facts pursuant to 28 U.S.C. § 1367(a), as well as due to the fact that the parties to this suit are citizens of different States, and the amount at controversy is in excess of $75,000, pursuant to 28 U.S.C. §1332.

7.        This Court may properly maintain personal jurisdiction over Defendant Vestas Blades America, Inc. because Defendant is a foreign business entity registered to do business

within the District of Colorado, and is, and was at all times relevant to this complaint, actually doing business within the District of Colorado.

8.      The events and/or omissions complained of herein and giving rise to the claims herein occurred, or had their principal effect, within the District of Colorado, and therefore venue is proper within this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.      Plaintiff Alan Meins ("Mr. Meins") is a citizen of the United States and a domiciliary of the State of Colorado.  At the time of the acts complained of herein, Mr. Meins was a domiciliary of the State of Colorado.  At all times relevant to the allegations in this Complaint, up until his termination, Mr. Meins was an employee of Vestas Blades America, Inc. ("Vestas").

10.     Plaintiff Patrick Allen ("Mr. Allen") is a citizen of the United States and a domiciliary of the State of Colorado.  At the time of the acts complained of herein, Mr. Allen was a domiciliary of the State of Colorado.  At all times relevant to the allegations in this Complaint, up until his termination, Mr. Allen was an employee of Vestas.

11.     Defendant Vestas Blades America, Inc. is a Delaware corporation, registered as a foreign entity doing business in the State of Colorado.  Defendant Vestas is an employer within the meanings set forth in applicable state and federal law, and was, at all times relevant to the allegations in this Complaint, up until the termination of their employment, both Plaintiffs' employer.

## ADMINISTRATIVE PREREQUISITES

12.     Mr. Meins timely filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission (EEOC-Charge No. 541-2016-027074) on July 1, 2016, for discrimination based on age, disability and retaliation.  At Mr. Meins' request, the EEOC issued a Notice of Right to Sue, which Mr. Meins received on June 5, 2017.

13.     Mr. Allen timely filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission (EEOC-Charge No. 541-2016-02353) on August 10, 2016 for discrimination based on age, disability and retaliation.  At Mr. Allen's request, the EEOC issued a Notice of Right to Sue, which Mr. Allen received on September 1, 2017.

## GENERAL ALLEGATIONS

### A.  Background

14.     Plaintiffs incorporates all preceding and subsequent paragraphs as if fully set forth herein.

15.     Defendant Vestas is a company that manufactures, among other things, blades and other materials associated with wind energy. Vestas operates many facilities worldwide, and its North American operation includes at least four facilities in Colorado.

16.     Plaintiffs Mr. Meins and Mr. Allen were both employed at the Vestas facility located at at 11140 Eastman Park Drive, Windsor, Colorado (the "Windsor Facility").

17.     At all times relevant to this complaint, the Windsor Facility fell under the oversight and management of Vice President Hans Jespersen.

18.     Mr. Meins began working for Vestas at the Windsor Facility in or around February of 2014.

19.     During his time with Vestas, Mr. Meins received positive feedback regarding his work ethic, knowledge and overall skills.  The only instances in which Mr. Meins recalls receiving negative feedback from his superiors at Vestas was when he complained about ongoing discrimination and/or safety issues at the Windsor Facility, as detailed below.

20.     Mr. Allen began working for Vestas at the Windsor Facility in or around January of 2014.

21.     During his time with Vestas, Mr. Allen received positive feedback regarding his work ethic, knowledge and overall skills.  The only instances in which Mr. Allen recalls receiving negative feedback from his superiors at Vestas was when he complained about ongoing discrimination and/or safety issues at the Windsor Facility, as detailed below.

22.     Both Mr. Meins and Mr. Allen were hired into "Production" positions at Vestas, a job category that included a wide range of job duties, and a category in which employees were often moved around to different job duties, assignments or "teams" for a variety of reasons.

23.     As detailed below, both Mr. Allen and Mr. Meins ultimately suffered the onset of disabilities which involved limited restrictions.  Within Vestas' Production worker positions, there were many job duties or responsibilities that both Plaintiffs could perform with no accommodation, as well as many duties or responsibilities that Plaintiffs could perform with minimal, low cost and low impact accommodation.

**B.  Rampant Discrimination Directed at Older Vestas Employees**

24.     Throughout the time that Mr. Meins and Mr. Allen worked at Vestas, both were subjected, on a daily basis, to insults, derogatory comments and harassment directed at their age.

25.     Mr. Meins is, as of the date of this Complaint, 59 years old, and Mr. Allen is 66 years old.  Upon information and belief, at the time of the illegal acts contained of herein, the majority (or a significant plurality) of the Vestas workforce at the Windsor Facility was under the age of 40, and the management and supervisory positions at the Windsor Facility were disproportionately filled by employees under the age of 40.

26.     The younger employees at the Windsor Facility would, on a daily basis, deride the older employees, including both of the Plaintiffs, with terms like "old man" and "old mother f*cker," or other derisive and derogatory variations on that theme.

27.     The younger employees would loudly gripe that the "old men" could not keep up physically, would openly berate and mock older employees, and in some circumstances would push the older employees to do more strenuous and/or manual work.

28.     For example, Mr. Allen was told by a younger employee, on one occasion, that he "look[ed] like sh*t" and this employee suggested that Mr. Allen just "go home before you die." This comment was made in front of a supervisor, who took no remedial action.

29.     These attacks by the younger employees were almost constant, and it was not uncommon for an older employee (including Mr. Meins and Mr. Allen) to be referred to as "stupid old man," or some variation on that, 10 or more times per day.

30.     In fact, this derision was so persistent, and so accepted at the Windsor Facility, that very few younger employees ever referred to Mr. Meins or Mr. Allen by their first names, instead simply calling them "old man" or some other derogatory variation.

31.     As detailed below, Vestas' management acquiesced, encouraged and in some cases participated in this hostility towards the older employees, adding to the humiliation and overall hostility of the environment.

### i. Physical threats against Mr. Meins because of his age

32.     On multiple occasions, younger employees physically threatened Mr. Meins.

33.     One such incident involved a younger employee, who boasted of being a trained mixed martial arts fighter, rallying a gang of 6-8 younger employees to attack and beat the "old man" (Mr. Meins) after work.

34.     Mr. Meins reported this threat to a supervisor, who shrugged off the threat and took no action.

35.     On another occasion, a younger employee approached Mr. Meins, flanked by many other younger employees who surrounded Mr. Meins, and began shouting at Mr. Meins, telling him he wanted to "go outside right now" and fight. This younger employee repeatedly referred to Mr. Meins as a "worthless old man" in making these threats, while the multiple other employees surrounding Mr. Meins sneered, leaned over Mr. Meins flexing, in an effort to intimidate the "old man."

36.     Mr. Meins reported this second threat of violence to a supervisor, who took no action.

37.     Mr. Meins also mentioned his intent to report the threats of violence to a younger co-worker, who laughed, completely unconcerned that Vestas would take remedial action, and told Mr. Meins "f*ck you old man, get the f*ck out of here."

### ii. No action in response to many complaints about age discrimination; express threats of retaliation

38.     In addition to the specific reports of age discrimination described herein, both Mr. Meins and Mr. Allen made multiple complaints to Vestas about this harassment and age-based discrimination.  In response to these complaints, supervisors routinely simply laughed them off, told the Plaintiffs to ignore it, or to grow thicker skin.

39.     Mr. Allen, upon complaining to one supervisor, was told by the supervisor that he had chosen the wrong place to work if he couldn't handle "good natured ribbing."

40.     Indeed, many supervisors and managers often witnessed this discrimination directed at older employees, and took no remedial action of any kind.  Some supervisors and managers even participated in this misconduct.

41.     Mr. Jesperson himself witnessed multiple instances in which Plaintiffs (as well as other older employees) were derided and attacked by younger employees.

42.     On one occasion, a younger employee yelled at Mr. Allen that "you old guys don't belong here," and that Mr. Allen should "go back to the geriatric wing."  These comments were made, loudly, in front of Mr. Jesperson.

43.     When Mr. Allen complained about these comments to Mr. Jesperson, Mr. Jesperson told Mr. Allen to work out these issues on his own time, and not on the "company clock."

44.     Mr. Allen was also expressly told by one supervisor that if he continued to complain about age discrimination, he would not receive promotions, and would likely be terminated by Vestas.

45.     This same supervisor mentioned immediately above would later confirm to Mr. Allen that he would not considered for a promotion because he was too vocal in complaining about harassment, discrimination and safety issues.

46.     Early in his employment, Mr. Allen was told that Vestas' decision to not move him off of temporary/probationary status after 90 days was expressly because he had complained about age discrimination.

### iii. Benefits to younger employees

47.     Throughout their time at Vestas, both Plaintiffs observed that younger employees routinely received preferential treatment and additional benefits not afforded to older employees.

48.     For example, promotions were, more often than not, given to younger employees, in some cases in circumstances in which older employees were not even afforded the opportunity to apply for those opportunities.

49.     Younger employees were, far more often than the employees in the Plaintiffs' age group, given preferred work assignments, supervisory authority and other benefits.

50.     Older employees, on the contrary, were discouraged for applying for promotions or better positions within the company.

51.     As described in more detail below, Mr. Meins was performing admirable work with an engineering division with the company.  Vestas suddenly and summarily determined that this work was no longer available to Mr. Meins, and upon information and belief, replaced Mr. Meins with a man under the age of 30.  This younger employee, upon information and belief, had been slated for termination from another position, and appealed directly to Mr. Jespersen for a

new job.  Mr. Jespersen, upon information and belief, gave this younger employee Mr. Meins'

position without even requesting a resume.

52.     As described in more detail below, within the job descriptions of the positions

held by both Plaintiffs, there were work duties that were inherently more physically demanding,

and duties that were less physically demanding, as well as duties that were more appealing due to

the fact that they entailed less work, or more desirable work.  The less physically demanding

and/or more desirable duties were disproportionately given to the younger employees, as

compared to older employees.

53.     Generally, upon information and belief and based upon the observations of

Plaintiffs during their time in Vestas, younger employees in similar situations to the Plaintiffs

with regards to physical limitations, including disabilities, were offered significantly more

opportunities to assume different job duties to accommodate those limitations, and were

terminated and/or removed from the workforce far less frequently than older employees in the

Plaintiffs' age range.

### C. Mr. Meins' Injury, Disability and Ultimate Termination

54.     In October of 2014, Mr. Meins began to experience intense pain in his elbows,

caused by repeated stretching and lifting as part of his work with Vestas.

55.     When Mr. Meins reported this to a supervisor, the supervisor told him that a

workers' compensation process would not be initiated, and refused to grant Mr. Meins' request

to move to a less-physically demanding role within his position.

56.     The pain continued to increase, and in January of 2015, it reached a crippling level of pain, and after Mr. Meins demanded that the workers' compensation process be initiated, he was finally provided the opportunity to do less physically demanding work.

57.     After the onset of his arm condition, Mr. Meins also suffered a second injury at Vestas, which resulted in a labral tear in his left hip which creates difficulty in standing, walking and sitting for extended periods.  Upon information and belief, this injury, which ultimately resulted in disability, was also an impetus for Vestas' adverse actions against Mr. Meins.

### *i. Ample work for Mr. Meins despite elbow condition*

58.     From January of 2015 until September of 2015, Mr. Meins performed a number of functions for Vestas, including but not limited to extensive work within the Windsor Facility's engineering division.

59.     Mr. Meins, who has an extensive technical background, excelled with the engineering division, and was singled out for praise for his work.

60.     Early on in this process, Mr. Meins spoke with a safety manager at Vestas regarding permanent work in that position, and the manager immediately became hostile, telling Mr. Meins that, once he recovered from his condition or reached a maximum medical improvement, he would be terminated.

61.     Mr. Meins was concerned by this statement by the safety manager – which in hindsight was apparently indicative of Vestas' general practices with regards to employees in similar situations – but resolved to work as hard as he could, do exceptional work, and make himself indispensable.

13

62.     Mr. Meins did just that, and garnered significant praise from the engineering department for performing complicated work at a high level.

63.     In the late-summer of 2015, after being told that he would ultimately require two surgeries to address his elbow condition, Mr. Meins approached his supervisor in the engineering department about the prospect of making his position permanent.

64.     Mr. Meins' supervisor assured Mr. Meins that the department and other management at Vestas were actively discussing making his position permanent, and indicated that they hoped to make such position permanent due to Mr. Meins' excellent work.

### ii. Vestas eliminates Mr. Meins' ability to work following report of pending surgeries

65.     Mr. Meins, confident that he would have a long-term position with Vestas based on the excellent feedback he was receiving from the engineering department, and the prospects of a permanent position, informed Vestas that he would require surgery, and prepared for his first surgery on September 18, 2015.

66.     In order to receive the surgery, Mr. Meins requested FMLA leave.

67.     Just weeks prior to Mr. Meins taking brief FMLA leave for the surgery, but after Mr. Meins had informed Vestas of his need for FMLA leave, Vestas installed a younger employee – who was, upon information and belief, under the age of 30 – in the engineering department.

68.     Upon information and belief, this younger employee did not submit a formal application, nor did he apply for any formal job opening, he was simply placed in this department and instructed to take over some of Mr. Meins' job responsibilities.

69.     Mr. Meins was concerned about losing his job, but received assurances that his job would be waiting for him after his surgery.

70.     Shortly following the surgery on September 18, 2015, when Mr. Meins attempted to return to work following 10 days of FMLA leave, Vestas suddenly and summarily informed Mr. Meins that it no longer had "meaningful work" for him.

71.     Specifically, on September 28, 2015, Mr. Meins returned to work with doctor approval for his return – pursuant to certain restrictions which would not have impacted his ability to perform the work he had been doing prior to his surgery – and Vestas sent Mr. Meins home.

72.     Vestas refused to allow Mr. Meins to return to work despite the facts that (i) Mr. Meins had been performing meaningful work, uninterrupted, for seven months prior, (ii) the work Mr. Meins had been doing with the engineering department was still needed (although he had ostensibly been replaced in that capacity by a much younger employee); and (iii) the physical restrictions post-surgery would in no way impede Mr. Meins' previous work with the engineering department.

73.     The younger employee who apparently replaced Mr. Meins in the engineering department is the younger employee referenced above, who pleaded with Mr. Jespersen for a new job, and was summarily planted in Mr. Meins' position.  This younger employee, upon information and belief, had none of the experience or technical know-how of Mr. Meins, and did not go through any type of interview or application process prior to being awarded this position and supplanting Mr. Meins.

74.     After being told Vestas had no work for him, Mr. Meins heard from Vestas only once more, a few days following his attempt to return to work, at which time Vestas demanded passwords and computer access information so that the younger employee who had replaced Mr. Meins could assume his duty.

75.     In the months following his surgery in September of 2015, Vestas told Mr. Meins that Vestas would contact Mr. Meins when it had work available for him, given his restrictions.

76.     Mr. Meins received no further contact from Vestas following September of 2015, but he remained an employee of the company and retained his company health benefits.

77.     In May of 2016, Mr. Meins attempted to utilize his health insurance and was informed by the insurance carrier that his insurance had been terminated.  When Mr. Meins inquired further, he learned that Vestas had terminated his employment, although Vestas at no juncture informed Mr. Meins of this fact.

### iii. Mr. Meins' disability

78.     At the time of Vestas' initial adverse actions against Mr. Meins, his condition – diagnosed as bi-lateral epicondylitis in both elbows – caused him overwhelming, severe pain, and extreme weakness.  Following surgery on both elbows, however, Mr. Meins' disability, while it limits many life functions, permits him to engage in many physical activities, and would permit him to work at Vestas with limited accommodation.

79.     Even after the completion of surgeries on both arms, Mr. Meins suffers from a permanent disability which causes him ongoing pain and weakness in both arms, as well as a lack of a full range of motion in the other arm.

16

80.    The disability limits Mr. Meins in a number of basic life activities, including but not limited to lifting, reaching, performing manual tasks, and engaging in physical activities such as sports.

81.    Mr. Meins is still dealing with this disability today.

82.    Mr. Meins also suffers from a permanent disability following a labral tear in his left hip.

83.    Mr. Meins was suffering from this hip condition throughout 2015, until he was ultimately removed from Vestas' workforce in September of 2015.  Because this disability stemmed from a workplace injury, it was reported to Vestas.

84.    This hip condition limits many basic life activities including walking, standing and sitting for extended periods of time.

85.    Furthermore, based upon Vestas' actions, including its cursory conclusion – without any inquiry, interactive process or other engagement with Mr. Meins – that Mr. Meins could not work for Vestas, it is clear that Vestas perceived Mr. Meins to suffer from a disability.

86.    Between September of 2015 and May of 2015, Vestas made no effort to contact Mr. Meins or to attempt to ascertain the extent and impact of his disability, nor did Vestas make any such effort any time prior.

87.    Between September of 2015 and May of 2015, Vestas made no effort to offer reasonable accommodation to Mr. Meins, or to engage in any type of interactive process with regards to his disability, nor did Vestas make any such effort any time prior.

88.     Between September of 2015 and May of 2015, Vestas made no effort to identify the precise job related limitations that may have been triggered by Mr. Meins condition, nor did Vestas make any such effort any time prior.

89.     Had Vestas engaged in any effort, whatsoever, to determine the precise job related limitations associated with Mr. Meins' disability, or to engage in an appropriate interactive process to ascertain reasonable accommodations under which Mr. Meins could perform his job, such potential reasonable accommodations may have included, but are not necessarily limited to, the following:

    a.  assignment to duties within the Production job description which did not exacerbate, or were not limited by, Mr. Meins disability.  There were individuals holding the same Production position as Mr. Meins who performed work which fit this category;

    b.  restructuring of the Mr. Meins' duties and position to accommodate the narrow physical restrictions;

    c.  permanently reassigning Mr. Meins to a role with the engineering team, a role he had been performing in, admirably, prior to Vestas suddenly and summarily determining it no longer had "meaningful work" for Mr. Meins; and

    d.  allowing for simple accommodations such as assistance with certain heavy lifting tasks, or other standard reasonable accommodations for similar, physical tasks.

90.     With regards to Mr. Meins' hip condition, meanwhile, had Vestas engaged in any effort, whatsoever, to determine the precise job limitations associated with Mr. Meins' disability, or to engage in an appropriate interactive process to ascertain reasonable accommodations under which Mr. Meins could perform his job, such potential reasonable accommodations may have

included, but are not necessarily limited to, each of the accommodations described in the paragraph immediately above, as well as additional accommodations such as allowing Mr. Meins brief breaks to sit for five minutes and rest, or permitting him to briefly walk the Windsor Facility in order to stretch.

91.     None of the above-referenced accommodations would have, on its face, created undue hardship for Vestas.

92.     Vestas, however, made no effort to even consider such accommodations before sending Mr. Meins home from work, and terminating his employment.

93.     Vestas made no good faith effort to identify reasonable accommodations that would have permitted Mr. Meins to perform the essential functions of his job.

94.     Upon information and belief, and based upon Vestas' approach to other employees (including Plaintiff Mr. Allen) similarly situated to Mr. Meins, it appears that it was Vestas' policy to terminate employees rather than make any effort to comply with the company's obligations under the ADA.

95.     But for this bad faith on the part of Vestas, Vestas would have ascertained that Mr. Meins could perform the essential functions of his job, with minimal accommodation.

**C. Mr. Allen's Injury, Disability, Complaints About Discrimination and Termination**

96.     In October of 2014, Mr. Allen began suffering from a serious respiratory condition caused by exposure to chemicals as part of his work with Vestas.

97.     Mr. Allen reported this condition to Vestas and was reassigned to perform work which did not expose him to chemicals.

98.     From October of 2014 until early June of 2015, Mr. Allen worked a full-time schedule at Vestas and performed a range of duties which did not require exposure to chemicals. This included work in front office positions for engineers, extensive work in fit testing for respiratory masks, and work with Vestas' training division.

99.     Most significantly during this time period, Mr. Allen worked extensively with Vestas' health and safety department due to his past experience with employee safety.

100.    Mr. Allen was praised for his work with health and safety, and Vestas' health and safety manager actively discussed Mr. Allen taking a permanent position in the department. These discussions of a permanent position ended, however, after Mr. Allen made a presentation on various safety issues to Mr. Jespersen, and Mr. Jespersen responded angrily that he did not wish to be lectured on safety issues by a "production worker."

101.    Mr. Jespersen's response was common at Vestas.  Any efforts to address concerns, whether safety issues, or ongoing issues with discrimination and hostile work environment, were met with anger and animosity from management, threats of termination, and in many cases overt adverse actions.

102.    Throughout this time period, however, Mr. Allen could have returned to duties which did require exposure to chemicals, if Vestas would provide Mr. Allen with a basic respiratory mask.  As detailed below, Vestas repeatedly declined to provide this mask to Mr. Allen.  Mr. Allen also could have performed countless other duties within the Production position.

### *i. Mr. Allen raises spectre of EEOC charge, other complaints*

103.    On or around June 2, 2015, Mr. Allen met with Vestas' HR Manager and raised complaints regarding the ongoing harassment and discrimination directed at older employees, Mr. Allen included, as well as general concerns about safety at Vestas – and failures to address ongoing safety issues which were a threat to Vestas – and the likelihood that he would require accommodation for his respiratory condition.

104.    During this meeting, Mr. Allen stated that he had raised these concerns many times before, and Vestas never took action.  Mr. Allen suggested to the HR Manager that raising the issue with the EEOC may be appropriate, and may prompt more meaningful changes.

105.    In response to this mention of the EEOC, the HR Manager falsely told Mr. Allen that he had no right to go to the EEOC due to the fact that he had an ongoing workers' compensation claim.

106.    Immediately following this meeting in which Mr. Allen raised the prospect of an EEOC charge – either the day of the meeting, or the following day – the HR Manager informed Mr. Allen that: (i) Vestas no longer had meaningful work for Mr. Allen, and that he should leave work immediately, despite the fact that he had been actively working for eight months; and (ii) that, once Mr. Allen reached maximum medical improvement, he would be assigned an impairment rating and he would be terminated without further discussion.

107.    Mr. Allen objected that he had been doing "meaningful work" for Vestas for eight months, and suggested other duties – within the position of Production worker that he was hired to – that he could seek reassignment to.  The HR manager responded by stating that, because of his "disability," Mr. Allen would not be considered for any current or future Vestas positions.

108.    Vestas would ultimately wait roughly 11 months to terminate Mr. Allen – and during that time, as described below, would ignore repeated attempts by Mr. Allen to return to work and discuss accommodations for his disability – but the decision to terminate Mr. Allen was, upon information and belief and based upon Vestas' own actions and statements, made immediately following the above-described June 2, 2015 meeting.

### ii. Vestas terminates Mr. Allen

109.    Following these discussions with the HR Manager in the first days of June 2015, Mr. Allen returned home and awaited word from Vestas on when he could return to work.

110.    Mr. Allen made many phone calls, as well as sent letters, to Vestas between the time period of June, 2015 and May of 2016, attempting to resume work with the company. Vestas ignored these repeated communications from Mr. Allen.

111.    In April of 2016, Mr. Allen received a letter from Vestas asserting that Vestas had been attempting to identify accommodations for Mr. Allen's respiratory condition, and had determined that he could not be accommodated in any way.  As described below, Vestas never, at any juncture, made any contact with Mr. Allen regarding such accommodation or efforts to identify such accommodation.

112.    The April, 2016 letter requested that Mr. Allen contact a Vestas representative if he wished to contest this determination.  Mr. Allen placed phone calls and sent a letter to this representative and never received a response.  Vestas now falsely claims that Mr. Allen never initiated such contact.

113.    On May 12, 2016, Vestas formally terminated Mr. Allen.

114.    Upon information and belief, and based upon the express statements of Vestas' HR Manager, Vestas made the decision to terminate Mr. Allen immediately following his mention of an EEOC charge to Vestas' HR Manager, in June of 2015.

### iii. Mr. Allen's disability

115.    Mr. Allen suffers from a permanent respiratory condition which dramatically reduces his lung capacity.

116.    Mr. Allen is still dealing with this permanent disability today.

117.    Mr. Allen's disability causes him lung and chest pain, major shortness of breath, severe sensitivity to chemical fumes, cold air and other environmental factors, frequent and prolonged coughing, difficulty breathing at higher altitudes, and difficulty breathing while laying down.

118.    Mr. Allen's disability left Mr. Allen substantially limited in in a number of basic life activities, including but limited to: walking for extended periods, jogging, handling certain household chemicals, breathing freely, sleeping comfortably, extended physical activity, and manual tasks.

119.    Furthermore, based upon Vestas' actions, including the express statement from the HR Manager that Mr. Allen would never be hired to any other position at Vestas because of his disability, it is clear that Vestas perceived Mr. Allen to suffer from a disability.

120.    Between June of 2015 and May of 2016, Vestas made no effort to contact Mr. Allen or to attempt to ascertain the extent and impact of his disability, nor did Vestas make any such effort any time prior.

121.     Between June of 2015 and May of 2016, Vestas made no effort to offer reasonable accommodation to Mr. Allen, or to engage in any type of interactive process with regards to his disability, nor did Vestas make any such effort any time prior.

122.     Between June of 2015 and May of 2016, Vestas made no effort to identify the precise job related limitations that may have been triggered by Mr. Allen condition, nor did Vestas make any such effort any time prior.

123.     Had Vestas engaged in any effort, whatsoever, to determine the precise job related limitations associated with Mr. Allen's condition, or to engage in an appropriate interactive process to ascertain reasonable accommodations under which Mr. Allen could perform his job, such potential reasonable accommodations may have included, but are not necessarily limited to, the following:

a.   utilization of a respirator mask which, at most, would have cost Vestas approximately $30;

b.   assignment to duties within the Production job description which did not exacerbate, or were not limited by, Mr. Allen's disability.  There were individuals holding the same Production position as Mr. Allen who performed work which fit this category, and which did not involve extensive exposure to chemicals;

c.   restructuring of the Mr. Allen's duties and position to accommodate the narrow physical restrictions.

124.     None of the above-referenced accommodations would have, on its face, created undue hardship for Vestas.

125.     In particular, a respirator mask would have cost Vestas roughly $30, and would have permitted Mr. Allen to continue the work he was doing prior to the onset of his disability.

126.     Vestas, however, upon information and belief, either refused such accommodations or refused to consider such accommodations, before sending Mr. Allen home from work, and ultimately terminating his employment.

127.     Vestas made no good faith effort to identify reasonable accommodations that would have permitted Mr. Allen to perform the essential functions of his job.

128.     Upon information and belief, and based upon Vestas' approach to other employees (including Plaintiff Mr. Meins) similarly situated to Mr. Allen, it appears that it was Vestas' policy to terminate employees rather than make any effort to comply with the company's obligations under the ADA.

129.     But for this bad faith on the part of Vestas, Vestas would have ascertained that Mr. Allen could perform the essential functions of his job, with, at most, minimal accommodation.

### iv. Mr. Allen's ongoing efforts to improve safety issues at Vestas

130.     Both Mr. Allen and Mr. Meins often raised concerns about general safety practices at Vestas, as well as specific practices that they felt were a threat to their fellow workers.

131.     Mr. Allen in particular raised these safety concerns on countless occasions, and did not shy away from elevating these concerns to the safety manager, to Mr. Jespersen, and to other senior managers.

132.     Mr. Allen was experienced in workplace safety issues, and would attempt to raise concerns regarding serious safety lapses and problems he observed at Vestas, whether they affected Mr. Allen personally, the general Vestas workforce or specific subsets of the workforce.

133.     Mr. Allen also proposed many remediation ideas and suggestions aimed at improving workforce safety.

134.     Mr. Allen was repeatedly warned that if he kept raising these issues, he would likely be terminated.  In fact, after presenting ideas for safety improvements to Mr. Jesperson (at the request of the safety manager), and after Mr. Jesperson became angry and announced his intent to ignore those suggestions, Mr. Allen was warned to let issue go, and stop raising safety concerns.

135.     Following the onset of Mr. Allen's respiratory condition, which would become a permanent disability, Mr. Allen became more outspoken about safety issues at Vestas, concerned about the safety of his co-workers with regards to similar respiratory issues arising out of exposure to chemicals, as well as other serious safety lapses and violations that he observed at Vestas.

136.     Mr. Allen, during the first half of 2015, repeatedly raised these concerns with Vestas' safety manager as well as with other members of Vestas' management, including Mr. Jespersen.

137.     Based on Mr. Allen's observations, his concerns were well-founded, as Vestas had an inordinate number of workplace injuries throughout his time with the company.

138.     The last opportunity Mr. Allen had to raise safety concerns was at the meeting with the HR Manager on or around July 2, 2015, when he complained that his efforts to improve

Vestas' seriously lacking safety procedures had been ignored and in some cases met with animosity.

### D.  Indicia of Vestas' Intentional Conduct and Knowledge of Unlawfulness

139.   Vestas purported to have HR policies against discrimination, and Vestas' management, upon information and belief, was aware of these policies, yet Vestas made no effort, whatsoever, to enforce these policies.

140.   With regards to the age discrimination and hostile work environment directed at Vestas' older workers, Vestas' management routinely ignored complaints of such discrimination, and in many cases encouraged or participated in.

141.   Many of the reports and complaints made by Mr. Meins and Mr. Allen included express statements that this type of age discrimination was prohibited, including Mr. Allen's statement to Mr. Jespersen after Mr. Jespersen witnessed a younger employee yelling at Mr. Allen to return to the "geriatric wing."

142.   Both Mr. Meins and Mr. Allen were warned, multiple times, that if they complained they would likely face retaliation, and as alleged above, both did face extensive retaliation for their willingness to complain about the unlawful acts described herein.

143.   Vestas' decision to terminate Mr. Allen, for instance, appears to have been a direct result of the fact that Mr. Allen raised the prospect of filing an EEOC charge of discrimination.

144.   Moreover, Vestas' own HR manager falsely stated to Mr. Allen that he was not permitted to file an EEOC charge.  Given that this HR manager presumably had extensive

training in the field, this appears to have been a willful lie, aimed at discouraging Mr. Allen from elevating his concerns to the EEOC.

145.     This same HR manager also expressly told Mr. Allen that – regardless of whether his disability improved or accommodations were available – he <u>would</u> be terminated, and he <u>would not</u> be considered for any other positions because of his disability.

146.     Mr. Meins, meanwhile, was similarly warned by a manager that his termination, following the onset of his disability, was inevitable, indicating that Vestas had no interest in even pretending to meet its obligations to attempt to accommodate his disability.

147.     Mr. Allen and Mr. Meins are aware of multiple other complaints of discrimination and unlawful conduct related to other employees arising out of those employees race and sex, as well as many complaints regarding age discrimination.   Those complaints were met with similar indifference, and in some cases animosity, from Vestas' management.

148.     Mr. Allen and Mr. Meins are also aware of other employees who appear to have been terminated in similar circumstances.

149.     Additionally, Vestas' treatment of Mr. Allen and Mr. Meins after it suddenly and summarily sent them home from work indicates a clear intention to flout its obligations under the ADA.

150.     After taking the initial adverse action of sending both Plaintiffs home from work, depriving them of income for months – under the false pretext that no "meaningful work" was available – Vestas made no effort, whatsoever, to engage with Mr. Allen or Mr. Meins, prior to terminating them.

151.    Vestas' stated reason for terminating Mr. Allen and Mr. Meins appears to be that Vestas made a determination that it could not accommodate Mr. Allen and Mr. Meins' disabilities, but over the 8-10 months between Vestas' original adverse action depriving the Plaintiffs of work and Vestas' ultimate termination of each Plaintiff, Vestas made no effort, whatsoever, to contact the Plaintiffs or engage in any interactive process.

152.    In Mr. Allen's case, Vestas sent a letter shortly before his termination alleging that some kind of accommodation assessment was underway, despite the fact that Vestas had been ignoring Mr. Allen's communications for months.

153.    When Mr. Allen attempted to contest Vestas' alleged determination that it could not accommodate, Vestas again ignored his calls and letters.

154.    In Mr. Meins situation, meanwhile, Vestas cut off all communication altogether. Mr. Meins was informed he had been "terminated" only after he attempted to utilize his health insurance and found it to be cancelled.

155.    Upon information and belief, Vestas' studied silence with regards to the Plaintiffs, for months after stripping them of their jobs with the company before formally terminating them, is indicative of an intent to attempt to shield the company from potential liability, without engaging in any effort to meet the company's obligations under the ADA.

### E.  Emotional Impacts of Defendants' Conduct on Plaintiffs

156.    The unlawful conduct and discrimination by Vestas caused significant emotional distress for both Plaintiffs, including but not limited to stress, fear, anxiety, eroded confidence, humiliation and significant economic tumult and anxiety.

157.     Both Plaintiffs had contemplated working for Vestas through retirement, and Mr. Allen had been clear with Vestas, from the date that he interviewed with the company, that he hoped to work for the company for at least 10 years.

**FIRST CLAIM FOR RELIEF**
**(Mr. Meins against Vestas: Discrimination under the ADA, as amended by the ADAAA, 42 U.S.C. § 12102, *et seq*. – Removal from Work; Termination)**

158.     Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as if fully set forth herein.

159.     Defendant Vestas is and at all relevant times was an employer engaged in an industry affecting commerce, with 15 or more employees, as defined in the ADA, 42 U.S.C. § 12111.

160.     Plaintiff Mr. Meins had a disability as defined by the ADA, as amended, in the form of physical impairments which substantially limits one or more major life activities, at the time that he was terminated by Vestas, and furthermore was perceived to have such a disability by Vestas.

161.     Vestas knew of Mr. Meins' disability.

162.     Mr. Meins had the skill, experience, education and other job related requirements to hold his position, and could perform the essential functions of his job with or without reasonable accommodation.

163.     Mr. Meins' disability was a motivating factor, in whole or in part, in Vestas' decision to terminate Mr. Meins.

164.   Mr. Meins' disability was also a motivating factor, in whole or in part, in Vestas' decision to remove Mr. Meins from Vestas' workforce and send him home in late September of 2015, which was both a precursor to Mr. Meins' termination, and a discrete adverse action.

165.   Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Meins' protected rights, and Vestas' obligations, under the ADA, as evidenced by, among other things, the facts that Vestas:  (i) had knowledge of its obligations under the ADA and purported to be a company that took discrimination seriously; (ii) upon information and belief, consciously avoided any conversation or interactive process related to Mr. Meins' disability; and (iii) exhibited hostility towards the rights of individuals with disabilities, as indicated by Vestas' treatment of other individuals with disabilities, the dishonest statements by the company's HR manager made to Mr. Allen, the admissions by the company's HR manager, as that, regardless of the actual status of his disability, Mr. Allen would unequivocally be terminated and would not be considered for future employment because of the disability, and similar statements by Vestas' safety manager that Mr. Meins would unequivocally be terminated.

166.   As a direct result of Vestas' unlawful and intentional conduct, Mr. Meins suffered both economic and non-economic losses and injuries.  As a result of the knowing and intentional conduct of Vestas, as well as the malice and/or reckless indifference of Vestas to its obligations under the ADA, and to Mr. Meins' rights under the ADA, Vestas is subject to punitive damages under the ADA.

167.   Mr. Meins prays for relief from these injuries and losses as set forth herein.

### SECOND CLAIM FOR RELIEF
**(Mr. Meins against Vestas:**
**Discrimination-Failure to Accommodate under the ADA, as amended by the ADAAA, 42**
**U.S.C. § 12102, *et seq*.)**

168.    Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as though fully set forth herein.

169.    Defendant Vestas is and at all relevant times was an employer engaged in an industry affecting commerce, with 15 or more employees, as defined in the ADA, 42 U.S.C. § 12111.

170.    Plaintiff Mr. Meins had a disability as defined by the ADA, as amended, in the form of physical impairments which substantially limit one or more major life activities, at the time that he was terminated by Vestas, and furthermore was perceived to have such a disability by Vestas.

171.    Vestas knew of Mr. Meins' disability.

172.    Mr. Meins could perform the essential functions of his job with or without reasonable accommodation.

173.    To the extent that any accommodation was necessaru, Mr. Meins could have performed his job on an even higher level if he had been provided with reasonable accommodations including but not limited to: (a) assignment to duties within the Production job description which did not exacerbate, or were not limited by, Mr. Meins' disability; (b) restructuring of the Mr. Meins' duties and position to accommodate the narrow physical restrictions; (c) reassigning Mr. Meins to a role with the engineering team, a role he had been performing in, admirably, prior to Vestas suddenly and summarily determining it no longer had "meaningful work" for Mr. Meins; and (d) allowing for simple accommodations such as assistance with certain heavy lifting tasks, or other standard reasonable accommodations for similar, physical tasks.

174.     Given the nature and costs of the above-described accommodations, the financial resources of Vestas, the operations of Vestas, and the impact upon Vestas, none of the above-described accommodations would present undue hardship for Vestas.

175.     Vestas failed to provide any of the above-described accommodations, and Vestas unreasonably failed to provide any other accommodations or to engage in the interactive process in good faith.

176.     Such failure was unreasonable and in bad faith due to the fact that Vestas made no effort of any kind to engage in accommodation, and cut off all communication with Mr. Meins before summarily terminating him.  Moreover, upon information and belief and based upon Vestas' HR manager's comments to Mr. Allen – stating that he would be terminated no matter what, and would not be hired to any other position – Vestas had no intention of engaging in any interactive process.

177.     Vestas' conduct was willful, wanton, malicious and/or in reckless disregard of Meins' protected rights, and Vestas' obligations, under the ADA, as evidenced by, among other things, the facts that Vestas:  (i) had knowledge of its obligations under the ADA and purported to be a company that took discrimination seriously; (ii) upon information and belief, consciously avoided any conversation or interactive process related to Mr. Meins' disability; and (iii) exhibited hostility towards the rights of individuals with disabilities, as indicated by Vestas' treatment of other individuals with disabilities, the dishonest statements by the company's HR manager made to Mr. Allen, and the admissions by the company's HR manager that, regardless of the actual status of his disability, Mr. Allen would unequivocally be terminated, and would not

be considered for future employment because of the disability, and similar statements by Vestas'

safety manager that Mr. Meins would unequivocally be terminated.

178.    As a direct result of Vestas' unlawful and intentional conduct, Mr. Meins suffered

both economic and non-economic losses and injuries.  As a result of the knowing and intentional

conduct of Vestas, as well as the malice and/or reckless indifference of Vestas to its obligations

under the ADA, and to Mr. Meins' rights under the ADA, Vestas is subject to punitive damages

under the ADA.

179.    Mr. Meins prays for relief from these injuries and losses as set forth herein.

### THIRD CLAIM FOR RELIEF
**(Mr. Meins against Vestas:**
**Unlawful Retaliation under 42 U.S.C. § 12203— Removal from Work; Termination)**

180.    Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as

though fully set forth herein.

181.    Defendant Vestas is and at all relevant times was an employer engaged in an

industry affecting commerce, with 15 or more employees, as defined in the ADA, 42 U.S.C. §

12111.

182.    Plaintiff Mr. Meins had a disability as defined by the ADA, as amended, in the

form of physical impairments which substantially limit one or more major life activities, at the

time that he was terminated by Vestas, and furthermore was perceived to have such a disability

by Vestas.

183.    Vestas knew of Mr. Meins' disability.

184.    Mr. Meins engaged in a protected activity under the ADA by fully informing

Vestas of his disability, which at the time had not yet been classified as a permanent injury; by

attempting to return to work, with doctor's restrictions, following the injury; by working in various capacities following the injury; and by attempting to engage in a dialogue with Vestas about making permanent job duties that would accommodate his injury.

185.   Upon being informed of Mr. Meins' disability, and pending surgery, as well as within weeks after Mr. Meins inquired about making permanent his duties with the engineering department (which would have fully accommodated his disability), Vestas promptly informed Mr. Meins that the work he had been doing for many months was no longer available, sent him home, and ordered him not to contact Vestas and to await further instruction.

186.   Removing Mr. Meins from Vestas' workforce, and from job duties which accommodated his disability, was both a precursor to Mr. Meins termination, and a discrete adverse action.  Vestas' decision to take this adverse action was motivated, in whole or in part, by retaliation against Mr. Meins exercising his rights and engaging in protected activities under the ADA.

187.   Vestas then, after allowing Mr. Meins to wait, in limbo, for 8 months, terminated Mr. Meins employment, which was a discrete adverse action motivated, in whole or in part, by retaliation against Mr. Meins exercising his rights and engaging in protected activities under the ADA.

188.   The retaliation on the part of Vestas deprived Mr. Meins of his ability to pursue his rights, and otherwise interfered with his rights to request and receive accommodation under the ADA, as amended.

189.   Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Meins' protected rights, and Vestas' obligations, under the ADA, as evidenced

by, among other things, the facts that Vestas: (i) had knowledge of its obligations under the ADA and purported to be a company that took discrimination seriously; (ii) upon information and belief, consciously avoided any conversation or interactive process related to Mr. Meins' disability; and (iii) exhibited hostility towards the rights of individuals with disabilities, as indicated by Vestas' treatment of other individuals with disabilities, the dishonest statements by the company's HR manager made to Mr. Allen, and the admissions by the company's HR manager that, regardless of the actual status of his disability, Mr. Allen would unequivocally be terminated, and would not be considered for future employment because of the disability, and similar statements by Vestas' safety manager that Mr. Meins would unequivocally be terminated.

190.   As a direct result of Vestas' unlawful and intentional conduct, Mr. Meins suffered both economic and non-economic losses and injuries.  As a result of the knowing and intentional conduct of Vestas, as well as the malice and/or reckless indifference of Vestas to its obligations under the ADA, and to Mr. Meins' rights under the ADA, Vestas is subject to punitive damages under the ADA.

191.   Mr. Meins prays for relief from these injuries and losses as set forth herein.

**FOURTH CLAIM FOR RELIEF**
**(Mr. Meins against Vestas:**
**Unlawful Retaliation under the FMLA, 29 U.S.C. § 2615(a)(1)—Removal from**
**Work)**

192.   Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as though fully set forth herein.

193.   Defendant Vestas is and at all relevant times was an employer engaged in an industry affecting commerce, with 50 or more employees, as defined in 29 U.S.C.  § 2611(4).

194.    Plaintiff Mr. Meins is an employee eligible for protection under the FMLA, who worked at least 1250 hours for Vestas in the 12 months prior to the retaliation complained of herein.

195.    Mr. Meins engaged in statutorily protected conduct by requesting FMLA leave for his surgery and by taking such FMLA leave from September 18, 2015 until he attempted to return to work on September 28, 2015.

196.    Vestas refused to permit Mr. Meins to return to work on September 28, 2015, stripped Mr. Meins of the job duties he had been performing for months prior, and sent him home to wait, in limbo, for 8 months before ultimately terminating Mr. Meins.

197.    Vestas also, within just weeks after Mr. Meins made his request for FMLA leave, placed a younger employee in the engineering department with the intention that he replace Mr. Meins.

198.    There is a causal connection between Vestas' adverse actions against Mr. Meins, and Mr. Meins' request for FMLA leave, which is evidenced by the close temporal proximity between Mr. Meins' requests for FMLA leave and Vestas' efforts to supplant him from the work he had been doing for months, and the even close temporal proximity between Mr. Meins taking FMLA leave and having those duties taken from him altogether, which was a precursor to his termination.

199.    Accordingly, Vestas' decision to remove Mr. Meins the workforce, and its decision to terminate Mr. Meins' employment 8 months later, were motivated, in whole or in part, by retaliation for Mr. Meins exercising his FMLA rights.

200.    Vestas' actions were knowing, intentional, and reflected a lack of good faith, as evidenced, among other things, by (i) Vestas' knowledge of its obligations under the FMLA, (ii) Vestas' efforts to lay the groundwork for Mr. Meins' removal by inserting a younger employee in his position just weeks before the scheduled FMLA leave, (iii) Vestas' ending Mr. Meins' work with the company immediately upon his return from FMLA leave, (iv) statements from Vestas management that Mr. Meins would eventually be terminated, as well as similar statements made with regards to the similarly-situated Mr. Allen, and (v) Vestas followed through on that promise of termination, but waited 8 months to formally terminate Mr. Meins after cutting off all contact.

201.    As a direct result of  Vestas' conduct, Mr. Meins suffered both economic and non-economic losses and injuries.  As a result of the knowing and intentional conduct of Vestas, and the lack of good faith of Vestas under the FMLA, Vestas is subject to liquidated damages under the FMLA.

202.    Mr. Meins prays for relief from these injuries and losses as set forth herein.

## FIFTH CLAIM FOR RELIEF
### (Mr. Meins against Vestas: Alternative claim for Discrimination in violation of the Age Discrimination in
### Employment Act, 29 U.S.C. § 621, et seq. – Removal from Work; Termination)

203.    Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as though fully set forth herein.

204.    At all times relevant, Plaintiff Mr. Meins was an employee of Defendant Vestas, over the age of 40, and at the time of his termination, Mr. Meins was 58 years old.

205.    Vestas is an employer, engaged in an industry affecting commerce with 20 or more employees.

206.    During Mr. Meins' employment with Vestas, Mr. Meins experienced an extensive and overwhelming culture of discrimination directed at older employees, including but not limited to: (a) an aggressively hostile work environment, as described in this Complaint, in which younger employees openly derided, mocked and humiliated older employees, often with the approval, acquiescence or participation of management; (b) physical threats levied against Mr. Meins that were explicitly motivated by his age; (c) passing over of older employees, including Mr. Meins, in favor of employees under the age of 40, for promotions, coveted job duties and responsibilities, including less-physical job duties and responsibilities; and (d) other benefits which were disproportionately bestowed upon employees under the age of 40 and withheld from employees who were older than 55 years of age.

207.    Upon information and belief, and based upon the observations of Plaintiffs during their time in Vestas, younger employees in similar situations to the Plaintiffs with regards to physical limitations, including disabilities, were offered significantly more opportunities to assume different job duties to accommodate those limitations, and were terminated and/or removed from the workforce far less frequently than older employees in the Plaintiffs' age range.

208.    Upon information and belief, and based upon the extreme hostile environment and history of discrimination described above, Vestas' decision to terminate Mr. Meins was motivated by Mr. Meins' age, and would not have occurred but for the fact that Mr. Meins fell into a group of discriminated against employees who were significantly older than 40.

209.    In September of 2015, Vestas took a separate discrete adverse action (as well as a precursor to Mr. Meins' termination) against Mr. Meins by installing a younger employee – upon information and belief, under the age of 30 – to perform the work with the engineering

department which Mr. Meins had performed for more than seven months. Upon information and belief and based upon the extreme hostile environment and history of discrimination described above, Vestas' decision to take this adverse action was motivated by Mr. Meins' age and the age of the younger employee, and would not have occurred but for the respective ages of Mr. Meins and the employee Vestas replaced him with.

210.    Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Meins' protected rights, and Vestas' obligations, under the ADEA, as evidenced by the facts that, among other things, the facts that Vestas: (i) had knowledge of its obligations under the ADEA and purported to be a company that took discrimination seriously; (ii) Vestas' management, including Mr. Jesperson, were aware of the rampant age discrimination, refused to take any action to curb or correct such discrimination, authorized many of the decisions which favored younger employees, and in some circumstances participated in such discrimination.

211.    Mr. Meins suffered damages, in an amount to be proven at trial, as a result of Vestas' actions.  Based upon the willful nature of Vestas' actions, Vestas is subject to liquidated damages under the ADEA.

212.    Mr. Meins prays for relief from these injuries and losses as set forth herein.

### SIXTH CLAIM FOR RELIEF
**(Mr. Allen against Vestas:**
**Discrimination under the ADA, as amended by the ADAAA, 42 U.S.C. § 12102, *et seq.*--**
**Termination)**

213.    Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as if fully set forth herein.

214.     Defendant Vestas is and at all relevant times was an employer engaged in an industry affecting commerce, with 15 or more employees, as defined in the ADA, 42 U.S.C. § 12111.

215.     Plaintiff Mr. Allen had a disability as defined by the ADA, as amended, in the form of a physical impairment which substantially limits one or more major life activities, at the time that he was terminated by Vestas, and furthermore was perceived to have such a disability by Vestas.

216.     Vestas knew of Mr. Allen's disability.

217.     Mr. Allen had the skill, experience, education and other job related requirements to hold the position, and could perform the essential functions of his job with or without reasonable accommodation.

218.     Mr. Allen's disability was a motivating factor, in whole or in part, in Vestas' decision to terminate Mr. Allen.

219.     Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Allen's protected rights, and Vestas' obligations, under the ADA, as evidenced by, among other things, the facts that Vestas: (i) had knowledge of its obligations under the ADA and purported to be a company that took discrimination seriously; (ii) upon information and belief, consciously avoided any conversation or interactive process related to Mr. Meins' disability; and (iii) exhibited hostility towards the rights of individuals with disabilities, as indicated by Vestas' treatment of other individuals with disabilities, the dishonest statements by the company's HR manager made to Mr. Allen, the admissions by the company's HR manager, as that, regardless of the actual status of his disability, Mr. Allen would unequivocally be

terminated and would not be considered for future employment because of the disability, and

similar statements by Vestas' safety manager that Mr. Meins would unequivocally be terminated.

220.     As a direct result of Vestas' unlawful and intentional conduct, Mr. Allen suffered

both economic and non-economic losses and injuries.  As a result of the knowing and intentional

conduct of Vestas, as well as the malice and/or reckless indifference of Vestas to its obligations

under the ADA, and to Mr. Allen's rights under the ADA, Vestas is subject to punitive damages

under the ADA.

221.     Mr. Allen prays for relief from these injuries and losses as set forth herein.

### SEVENTH CLAIM FOR RELIEF
**(Mr. Allen against Vestas:
Discrimination-Failure to Accommodate under the ADA, as amended by the ADAAA, 42
U.S.C. § 12102, *et seq.*)**

222.      Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as

though fully set forth herein.

223.     Defendant Vestas is and at all relevant times was an employer engaged in an

industry affecting commerce, with 15 or more employees, as defined in the ADA, 42 U.S.C. §

12111.

224.     Plaintiff Mr. Allen had a disability as defined by the ADA, as amended, in the

form of a physical impairment which substantially limits one or more major life activities, at the

time that he was terminated by Vestas, and furthermore was perceived to have such a disability

by Vestas.

225.     Vestas knew of Mr. Allen's disability.

226.     Mr. Allen could perform the essential functions of his job with or without

reasonable accommodation.

227.    To the extent that any accommodation was deemed necessary, Mr. Allen could have performed his job on an even higher level if he had been provided with reasonable accommodations including but not limited to: (a) utilization of a respirator mask which, at most, would have cost Vestas approximately $30; (b) assignment to duties within the Production job description which did not exacerbate, or were not limited by, Mr. Allen's disability; (c) restructuring of Mr. Allen's duties and position to accommodate the narrow physical restrictions.

228.    Given the nature and costs of the above-described accommodations, the financial resources of Vestas, the operations of Vestas, and the impact upon Vestas, none of the above-described accommodations would present undue hardship for Vestas.

229.    Vestas failed to provide any of the above-described accommodations, and Vestas unreasonably failed to provide any other accommodations or to engage in the interactive process in good faith.

230.    Such failure was unreasonable and in bad faith due to the fact that Vestas made no effort of any kind to engage in the interactive process, and summarily terminated Mr. Allen while ignoring his efforts to engage in such process.  Moreover, upon information and belief and based upon Vestas' HR manager's comments to Mr. Allen – stating that he would be terminated no matter what, and would not be hired to any other position – Vestas had no intention of engaging in any interactive process.

231.    Vestas' conduct was willful, wanton, malicious and/or in reckless disregard of Allen's protected rights, and Vestas' obligations, under the ADA, as evidenced by, among other things, the facts that Vestas: (i) had knowledge of its obligations under the ADA and purported to be a company that took discrimination seriously; (ii) upon information and belief, consciously

avoided any conversation or interactive process related to Mr. Allen's disability; and (iii)

exhibited hostility towards the rights of individuals with disabilities, as indicated by Vestas'

treatment of other individuals with disabilities, the dishonest statements by the company's HR

manager made to Mr. Allen, and the admissions by the company's HR manager that, regardless

of the actual status of his disability, Mr. Allen would unequivocally be terminated, and would not

be considered for future employment because of the disability.

232.    As a direct result of Vestas' unlawful and intentional conduct, Mr. Allen suffered

both economic and non-economic losses and injuries.  As a result of the knowing and intentional

conduct of Vestas, as well as the malice and/or reckless indifference of Vestas to its obligations

under the ADA, and to Mr. Allen's rights under the ADA, Vestas is subject to punitive damages

under the ADA.

233.    Mr. Allen prays for relief from these injuries and losses as set forth herein.

## EIGHTH CLAIM FOR RELIEF
### (Mr. Allen against Vestas:
### Unlawful Retaliation under 42 U.S.C. § 12203—Termination)

234.    Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as

though fully set forth herein.

235.    Defendant Vestas is and at all relevant times was an employer engaged in an

industry affecting commerce, with 15 or more employees, as defined in the ADA, 42 U.S.C. §

12111.

236.    Plaintiff Mr. Allen had a disability as defined by the ADA, as amended, in the

form of a physical impairment which substantially limits one or more major life activities, at the

time that he was terminated by Vestas, and furthermore was perceived to have such a disability by Vestas.

237.    Vestas knew of Mr. Allen's disability.

238.    Mr. Allen engaged in a protected activity under the ADA by fully informing Vestas of his disability, which at the time had not yet been classified as a permanent injury; by attempting to return to work, with doctor's restrictions, following the injury; by working in various capacities following the injury; and by attempting to engage in a dialogue with Vestas about making permanent job duties that would accommodate his injury.

239.    Mr. Allen also expressly raised the prospect of an EEOC charge, in the context of raising complaints to Vestas' HR Manager about, among other concerns, the accommodations necessary for his disability.

240.    Upon being informed of Mr. Allen's disability, as well as his raising of a prospective EEOC charge. Vestas promptly informed Mr. Allen that the work he had been doing for many months was no longer available, and sent him home to await further instruction.

241.    Vestas also expressly told Mr. Allen immediately following the above-described meeting that Vestas intended to terminate him, although Vestas allowed Mr. Allen to wait in limbo for roughly 11 months before formally terminating him.

242.    During that 11 month period, Mr. Allen continued to engage in protected activities under the ADA, repeatedly attempting to contact Vestas to discuss potential accommodations and a return to work.  The last of these efforts by Mr. Allen occurred in late-April of 2016; Vestas refused to engage in any response or dialogue to these efforts by Mr. Allen.

243.    Vestas' decision to terminate Mr. Allen in May of 2016 was a discrete adverse action motivated, in whole or in part, by retaliation against Mr. Meins exercising his rights and engaging in protected activities under the ADA.

244.    The retaliation on the part of Vestas deprived Mr. Meins of his ability to pursue his rights, and otherwise interfered with his rights to request and receive accommodation under the ADA, as amended.

245.    Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Allen's protected rights, and Vestas' obligations, under the ADA, as evidenced by, among other things, the facts that Vestas: (i) had knowledge of its obligations under the ADA and purported to be a company that took discrimination seriously; (ii) upon information and belief, consciously avoided any conversation or interactive process related to Mr. Allen's disability; (iii) falsely claimed that Mr. Allen had not attempted to engage in an interactive process, when Mr. Allen made countless efforts to initiate such process; (iv) exhibited hostility towards the rights of individuals with disabilities, as indicated by Vestas' treatment of other individuals with disabilities, the dishonest statements by the company's HR manager made to Mr. Allen, and the admissions by the company's HR manager that, regardless of the actual status of his disability, Mr. Allen would unequivocally be terminated, and would not be considered for future employment because of the disability.

246.    As a direct result of Vestas' unlawful and intentional conduct, Mr. Allen suffered both economic and non-economic losses and injuries.  As a result of the knowing and intentional conduct of Vestas, as well as the malice and/or reckless indifference of Vestas to its obligations

under the ADA, and to Mr. Allen's rights under the ADA, Vestas is subject to punitive damages under the ADA.

247.     Mr. Allen prays for relief from these injuries and losses as set forth herein.

### NINTH CLAIM FOR RELIEF
### (Mr. Allen against Vestas:
### Alternative claim for Discrimination in violation of the Age Discrimination in
### Employment Act, 29 U.S.C. § 621, et seq.—Termination)

248.     Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as though fully set forth herein.

249.     At all times relevant, Plaintiff Mr. Allen was an employee of Defendant Vestas, over the age of 40, and at the time of his termination, Mr. Allen was 65 years old.

250.     Vestas is an employer, engaged in an industry affecting commerce with 20 or more employees.

251.     During Mr. Allen's employment with Vestas, Mr. Allen experienced an extensive and overwhelming culture of discrimination directed at older employees, including but not limited to: (a) an aggressively hostile work environment, as described in this Complaint, in which younger employees openly derided, mocked and humiliated older employees, often with the approval, acquiescence or participation of management; (b) passing over of older employees, including Mr. Meins, in favor of employees under the age of 40, for promotions, coveted job duties and responsibilities, including less-physical job duties and responsibilities; and (c) other benefits which were disproportionately bestowed upon employees under the age of 40 and withheld from employees who were older than 55 years of age.  Mr. Allen is also aware of physical threats made against Mr. Meins which were motivated by his age.

252.    Upon information and belief, and based upon the observations of Plaintiffs during their time in Vestas, younger employees in similar situations to the Plaintiffs with regards to physical limitations, including disabilities, were offered significantly more opportunities to assume different job duties to accommodate those limitations, and were terminated and/or removed from the workforce far less frequently than older employees in the Plaintiffs' age range.

253.    Upon information and belief, and based upon the extreme hostile environment and history of discrimination described above, Vestas' decision to terminate Mr. Allen was a discrete adverse action motivated by Mr. Allen's age, and would not have occurred but for the fact that Mr. Allen fell into a group of discriminated against employees who were significantly older than 40.

254.    Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Allen's protected rights, and Vestas' obligations, under the ADEA, as evidenced by the facts that, among other things, Vestas: (i) had knowledge of its obligations under the ADEA and purported to be a company that took discrimination seriously; (ii) Vestas' management, including Mr. Jesperson, were aware of the rampant age discrimination, refused to take any action to curb or correct such discrimination, authorized many of the decisions which favored younger employees, and in some circumstances participated in such discrimination.

255.    Mr. Allen suffered damages, in an amount to be proven at trial, as a result of Vestas' actions.  Based upon the willful nature of Vestas' actions, Vestas is subject to liquidated damages under the ADEA.

256.    Mr. Allen prays for relief from these injuries and losses as set forth herein.

**TENTH CLAIM FOR RELIEF**
**(Mr. Allen against Vestas:**

**Alternative claim for Retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. – Termination)**

257.     Plaintiffs incorporates and re-alleges all preceding and subsequent paragraphs as though fully set forth herein.

258.     At all times relevant, Plaintiff Mr. Allen was an employee of Defendant Vestas, over the age of 40, and at the time of his termination, Mr. Allen was 65 years old.

259.     Vestas is an employer, engaged in an industry affecting commerce with 20 or more employees.

260.     Plaintiff Mr. Allen engaged in a protected activity under federal law by complaining to Defendant Vestas' HR director about the rampant age discrimination at Vestas, and the hostile work environment for older employees such as Mr. Allen, and by expressly suggesting that he may seek an EEOC charge in order to attempt to curb the rampant age discrimination.  This was the last of many times in which Mr. Allen complained about age discrimination and hostile work environment for older employees at Vestas.

261.     Immediately following Mr. Allen engaging in a protected activity as described above, Vestas: (i) suddenly and summarily informed Mr. Allen that he was to cease work altogether, causing material financial detriment to Mr. Allen; (ii) informed Mr. Allen that it no longer had "meaningful work" for him, despite the fact that he had been performing meaningful work for Vestas for months; (iii) sent Mr. Allen home and told him he would be contacted if "meaningful work" materialized; (iv) falsely informed Mr. Allen that he had no right to file an EEOC charge; (v) refused to answer Mr. Allen's numerous inquiries regarding his job status and his efforts to address the age discrimination issue; and (vi) advised Mr. Allen that he would eventually be terminated.

262.    The above-described actions by Vestas, in response to Mr. Allen complaining about age discrimination and a hostile work environment towards older employees, and referencing the prospect of an EEOC charge, were a precursor to Vestas' decision to terminate Mr. Allen; as the HR manager expressly stated, the decision to terminate Mr. Allen was made immediately following this conversation.

263.    The decision to terminate Mr. Allen was accordingly motivated by Mr. Allen's participation in a protected activity; but for Mr. Allen directly challenging the age discrimination and raising the prospect of an EEOC charge, Vestas would not have terminated Mr. Allen.

264.    Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Allen's protected rights, and Vestas' obligations, under the ADEA, as evidenced by the facts that, among other things, Vestas: (i) had knowledge of its obligations under the ADEA and purported to be a company that took discrimination seriously; (ii) Vestas' management, including Mr. Jesperson, were aware of the rampant age discrimination, refused to take any action to curb or correct such discrimination, authorized many of the decisions which favored younger employees, and in some circumstances participated in such discrimination; and (iii) Vestas baldly admitted, the day after Mr. Allen engaged in these protected activities, that Vestas intended to terminate Mr. Allen.

265.    Mr. Allen suffered damages, in an amount to be proven at trial, as a result of Vestas' actions.  Based upon the willful nature of Vestas' actions, Vestas is subject to liquidated damages under the ADEA.

266.    Mr. Allen prays for relief from these injuries and losses as set forth herein.

## ELEVENTH CLAIM FOR RELIEF
### (Mr. Allen against Vestas:

50

**Wrongful Discharge in Violation of Public Policy)**

267.    Mr. Allen was an employee of Vestas.

268.    Throughout his time at Vestas, Mr. Allen repeatedly raised concerns regarding serious safety concerns he observed at Vestas, both concerns which affected him personally, as well as concerns which affected the general Vestas workforce.

269.    Mr. Allen was repeatedly warned that if he kept raising these issues, he would likely be terminated.

270.    Following the onset of Mr. Allen's respiratory condition, which would become a permanent disability, Mr. Allen became more outspoken about safety issues at Vestas, concerned about the safety of his co-workers with regards to similar respiratory issues arising out of exposure to chemicals, as well as other serious safety lapses and violations that he observed at Vestas.

271.    Mr. Allen, during the first half of 2015, repeatedly raised these concerns with Vestas' safety manager as well as with other members of Vestas' management, including Mr. Jespersen.

272.    Based on Mr. Allen's observations, his concerns and willingness to raise those concerns and offer constructive instruction for avoiding safety problems were well-founded, as Vestas had an inordinate number of workplace injuries.

273.    In repeatedly raising these concerns about significant safety violations, refusing to take no for an answer, Mr. Allen was engaged in conduct that is protected and encouraged by public policy (including a variety of workplace safety statutes, such as the Occupational Safety

and Health Act) which are devoted to ensuring safe working conditions for employees and improving safety standards across all industries.

274.    Upon information and belief, and based upon the timing of the decision as well as the multiple warnings that complaining could result in termination, Vestas' decision to terminate Mr. Allen was motivated, in whole or in part, by retaliation against Mr. Allen for his repeated efforts to complain about safety violations, and improve the poor safety conditions at the Windsor Facility.

275.    Such termination by Vestas undermines the clearly expressed public policy in favor of ensuring safe working conditions for employees and improving safety standards across all industries.

276.    Vestas' actions were willful, wanton, malicious and/or performed in reckless disregard for Mr. Allen's protected rights, and Vestas' obligations, as well as for the public policy supporting safe working conditions and optimal safety standards for employees, as evidenced by the facts that, among other things, Vestas: (i) had knowledge, based upon an inordinate number of workplace injuries and other issues, of the safety concerns at its Windsor Facility; (ii) Vestas had knowledge, via the repeated complaints and suggestions for better safety procedures by Mr. Allen, of ways to improve its safety problems; and (iii) Vestas overtly and expressly rejected those suggestions, and expressly stated that Mr. Allen would likely be retaliated against, and terminated, if he persisted in raising these serious safety concerns.

277.    Mr. Allen suffered damages, in an amount to be proven at trial, as a result of Vestas' actions.  Based upon the willful nature of Vestas' actions, Vestas is subject to punitive damages to the extent permissitted by law.

278.     Mr. Allen suffered damages, in an amount to be proven at trial, as a result of Vestas' actions.  .

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order of this Honorable Court entering judgment in Plaintiffs' favor against Defendant Vestas, and that it award Plaintiffs' actual economic damages in an amount to be determined at trial, including but not limited to lost wages, benefits, back and front pay, and lost employment opportunities, that it award Plaintiffs compensatory damages including but not limited to those for future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish and other nonpecuniary losses, that it award Plaintiffs punitive damages and/or liquidated damages as allowed by law and in an amount to be determined at trial, that it award Plaintiffs' reasonable attorneys fees and costs of this litigation to the extent permissible by the statutes and other authority referenced herein, that it award Plaintiffs' pre-judgment interest and post-judgment interest as provided by law, and for such other and further relief as this Court deems equitably necessary, just and proper.

## JURY TRIAL DEMANDED

DATED this 1st day of September, 2017.

Respectfully submitted,

*/s/ Corey Preston*

_____

GRANT & HOFFMAN, P.C.
Brad L. Hoffman (34635)
Corey Preston (43536)
Elyse K. Ritchie (47437)
821 Ninth Street
Greeley, CO 80631

Telephone: (970) 356-5666
FAX: (970) 356-8967
Email: cpreston@greeleyattorneys.com
Attorney for Plaintiffs